## LOVEJOY *v.* WILLAMETTE ELECTRIC CO.

(51 Pac. 197.)

</div>

EVIDENCE OF FRAUD.—An allegation that defendants were guilty of fraud in an action to recover land in introducing in evidence a deed of plaintiff's ancestor to defendants' predecessors, when such deed had, in another action, been adjudged void, is not sustained where the only effect of the judgement in such other action was to determine that the land there in controversy was not in fact a part of that conveyed by such deed.

From Multnomah: LOYAL B. STEARNS, Judge.

This is a suit by Amos Lovejoy and others against the Willamette Falls Electric Company and other allied corporations to set aside a judgment in favor of the defendant corporations rendered in an action at law brought against them by the present plaintiffs to recover the possession of the island in the Willamette River at or near the falls at Oregon City, which was confirmed to the legal assignees of the Willamette Milling and Trading Company as "Abernethy Island," by the eleventh section of the act of congress relating to public lands in Oregon, approved September 27, 1850 (9 Stat. 496), on the ground that such judgment was recovered through a mistake of plaintiffs as to the *locus in quo*, and by fraud on the part of the defendants in introducing in evidence a certain deed executed by the plaintiffs' ancestor in 1863. The complaint, in substance, is: That at the time of the passage of the act of congress of 1850 known as the "Donation Law" there were, and are now, two islands in the Willamette River at or near the falls, one immediately above the other, and separated by a well defined channel, the upper one containing sixteen and one-half and the lower one about one and one-half acres; that the lower one was known and designated at the time as "Governor's Island," or the "Island Mill Property," and is the island confirmed to the assignees of the Willamette Milling and Trading Company by the act of congress referred to; that prior to the passage of such act George Abernethy undertook, by settlement or otherwise, to acquire title to the upper

island, and for that reason it was commonly known and designated at the time as "Abernethy Island"; that thereafter A. L. Lovejoy, the plaintiffs' ancestor, became by *mesne* conveyances the owner in fee simple of the island confirmed to the milling company as Abernethy Island, and also the owner of all the right, title, and interest of Abernethy to the upper island, which was likewise known and designated as "Abernethy Island;" that on February 28, 1863, Lovejoy and wife conveyed by deed to John H. Moore and others, according to the description in the deed, "what is known as 'Abernethy Island,' at the falls of the Willamette River, in Clackamas County, State of Oregon," intending, however, to convey thereby their interest in and to the upper island, and not to the island confirmed to the milling company by the act of congress; that the lower island never was conveyed by Lovejoy to any person, and was owned by him at the time of his death, in September, 1882, and is now owned and in possession of the plaintiffs; that on November 3, 1890, the plaintiffs were informed and believed that one of the defendant companies had taken possession of the lower island, and was proceeding to erect buildings thereon, and, acting under this information and belief, and without visiting the *locus in quo*, or considering the confusion likely to arise out of the similarity of names of the two islands, they began an action of ejectment to recover the possession of "an island in the Willamette River, situated at or near the falls of said river on the east side of said river, at or near Oregon City, in Clackamas County, State of Oregon, being the same island described and confirmed as 'Aber-

nethy Island' in the eleventh section of an act of congress of the United States relating to public lands in Oregon, approved February 27, 1850, with its appurtenances;" that in truth and in fact the defendant in such action was not then in possession or exercising any acts of ownership or possession over the land described in the complaint, but was in possession of the upper island, commonly known as "Abernethy Island;" that, taking advantage of the confusion in names, its lessor filed an answer denying the allegations of the complaint, and alleging title in itself, and pleading the statute of limitations; that the cause went to trial, and the plaintiffs, to maintain the issues on their part, introduced in evidence deeds from W. H. Farrar and wife and James Guthrie, Jr., of date July 9, 1862, conveying to their ancestor, A. L. Lovejoy, "the 'Island Mill Property,' so called, or 'Abernethy Island,'" and also testimony tending to show possession thereof by the plaintiffs and their ancestors since the date of such deeds; that the defendant thereupon, to maintain the issues on its part, offered in evidence the deed from Lovejoy and wife, of date February 28, 1863, conveying to J. H. Moore and associates what is known as "Abernethy Island" at the falls of the Willamet† River, in Clackamas County, Oregon, and other deeds through which the defendant claims title, and evidence tending to show continuous possession; that, although the conveyances referred to apparently describe the same premises, the two islands were in truth and in fact separate and distinct tracts of land, and the title thereto deraigned through separate channels; that, owing to the confusion growing

out of this similarity of names, the plaintiffs' attorney became confused, and proceeded to the trial on the theory that the island described in the complaint was identical with that described in the deed from Lovejoy and wife to Moore and associates, of date February 28, 1863; and, when his objection to the introduction of said deed was overruled, he abandoned the case, and judgment was thereupon rendered against the plaintiffs in favor of the defendant; that plaintiffs used all reasonable diligence to avoid the effect of such judgment, and to that end filed a motion for a new trial, which, being overruled, they filed an application to be relieved from the judgment on the ground of the mistake as to the *locus in quo*, which was also denied, and the ruling thereon subsequently affirmed by this court; that in prosecuting the motion to be relieved from the judgment, plaintiffs' sole object was to place the cause in the same position in which it was prior to the trial thereof, for the reason that the Abernethy Island of which the defendants were claiming the possession and the adverse occupancy under the statute of limitations was not the Abernethy Island owned by the plaintiffs, the recovery of which was sought in the action.

The complaint further alleges that in 1870 the defendants' predecessor in interest was in possession of the upper island, claiming title thereto under the deed from Lovejoy and wife to Moore and others, and while so in possession W. C. Johnson and J. L. Barlow brought an action of ejectment against it to recover possession of such island, and were successful; that it was adjudged therein that the defendant had no title

or interest in the island, and that the deed from Lovejoy and wife to Moore and others was held for naught; that the defendants in this suit, and in the action at law as well, knew of this litigation, and the result thereof, but, with intent to cheat and defraud plaintiffs, fraudulently, wrongfully, and deceitfully introduced said deed in evidence, and did thereby mislead, confuse, and deceive the plaintiffs and their counsel on account of the similarity of the names of said islands, and that they were so taken by surprise as to be unable to proceed intelligently with their defense. To this complaint the defendants filed an answer, in which it is denied that there were at the time of the passage of the act of congress of September 27, 1850, or are now, two islands at the falls of the Willamette at Oregon City, east of the channel thereof, and alleges that, although the plats and surveys of the United States now show two islands east of such channel, there is, in truth and in fact, but the one known and designated in the act of congress as "Abernethy Island." After denying the material allegations of the complaint, the answer, for a further and separate defense, alleges that the defendant, the Portland General Electric Company, is the owner in fee simple of the Abernethy Island mentioned and referred to in the donation law, and that it and its predecessors in interest have been in the open, notorious, exclusive, and peaceable posession thereof for more than thirty years, and that neither the plaintiffs nor their ancestors, predecessors, or grantors have been in possession during that time. The proceedings in the action at law subsequent to the judgment therein are then set out in

detail, and pleaded as a bar to this suit. A demurrer
to the separate defense being overruled, a reply was
filed, and upon the issues thus joined the cause was re-
ferred to Hon. W. D. Fenton, to report the facts and
the law. The referee having reported in favor of the
defendants, and his report having been confirmed, and
a decree entered in accordance therewith, the plain-
tiffs appeal.

<div align="right">Affirmed.</div>

For appellants there was a brief over the names of
*Dell Stuart*, and *Starr, Thomas & Chamberlain*, with an
oral argument by *Messrs. Stuart* and *Geo. E. Cham-
berlain*.

For respondent there was a brief and an oral argu-
ment by *Mr. Julius C. Moreland*.

Mr. Justice Bean, after making the foregoing
statement, delivered the opinion of the court.

Assuming, for the purposes of this case, that a
court of equity would, upon the facts alleged in the
complaint, if shown to be true, set aside and vacate
the judgment rendered in the action at law referred to
in the pleadings, and that the proceedings in such ac-
tion subsequent to the judgment are not a bar to this
suit, we pass directly to a consideration of the facts.
From the issues as made by the pleadings it appears
that the two important questions of fact in the case
are: First, whether the deed from A. L. Lovejoy and
wife to J. H. Moore and others, of date February 28,
1863, purporting to convey "what is known as 'Aber-

nethy Island,' at the falls of the Willamette River, in Clackamas County, State of Oregon," was intended to and did convey the island confirmed to the legal assignees of the Willamette Milling and Trading Company by the eleventh section of the act of congress approved February 27, 1850. If it did, this case is at an end, because it is conceded that the defendants have succeeded by mesne conveyances to whatever interest Moore and his associates obtained by virtue of the deed referred to, and, this being so, the exact location of the island is a matter of no consequence, so far as any rights of the plaintiffs are concerned. And, second, if the deed did not convey such island, the remaining question is whether the plaintiffs' right of suit is barred by the statute of limitations, and this depends upon the question as to whether the present electric light station is located upon the island referred to and designated in the act of congress of 1850 as "Abernethy Island." Of these questions in their order.

It appears from the evidence that prior to 1841 Dr. John McLaughlin settled upon a tract of land at Oregon City, which was subsequently known and designated in the donation law and on the public surveys of the United States as the "Oregon City Land Claim." As a part of this claim, he contended that a small island, containing two or three acres, in the river immediately in front thereof, belonged to him. But in 1841 or 1842 some persons referred to in the testimony as missionaries took possession of the island under the name of the Willamette Milling and Trading Company, or the Oregon Milling Company, and con-

structed a saw and grist mill and other improvements
thereon, and continued by themselves and assignees
to occupy the same, notwithstanding Dr. McLaughlin's
protest, until the passage of the act of congress of 1850.
Soon after they took possession of the island, their
right and title thereto became vested in George Aber-
nethy, provisional governor from 1845 to 1849, and
the island thereafter became known and designated as
" Governor's " or "Abernethy's " Island, or the " Island
Mill Property."    On April 25, 1849, Abernethy sold
the property to Joseph Lane, describing it in the con-
veyance as that certain portion of land " known as and
commonly called ' Governor's Island,' being an island
in the Willamette River, at the great falls, and the
same on which certain persons known as. the Oregon
Milling Company some time about the year 1842 con-
structed a saw and grist mill and other buildings and
improvements, and being the same which the party of
the first part purchased from said milling company."
On May 1, 1851, Lane conveyed the same to R. R.
Thompson by a deed describing it as " a certain por-
tion of land situate and being in the great falls of the
Willamette River, in the County of Clackamas, and
Territory of Oregon, known as and commonly called
' Governor's Island ' or 'Abernethy's Island.' "    On
May 17, 1857, Thompson conveyed to James Guthrie
by substantially the same description as in the Lane
deed, with the addition that the premises conveyed
were " the same island which was confirmed to the
Willamette Milling and Trading Company, and their
assigns, by the act of congress approved September 27,
1850."    On June 9, 1862, James Guthrie, Jr., and W.

H. Farrar and wife, who seem to have acquired some
interest in the property, conveyed it by separate deeds
to A. L. Lovejoy, in each of which the property is de-
scribed as "the 'Island Mill Property,' so called, or
'Abernethy Island,' situate at or near the falls of the
Willamette River, in Clackamas County, Oregon."
We have thus been particular to trace the title from
the milling company to Lovejoy, as it shows that the
property conveyed to him, and to which he obtained
title, was the island upon which the milling company
entered in 1842, and constructed their mills, and made
their improvements, and that it was known and desig-
nated in the deeds under which he held as "Abernethy
Island." When, therefore, he conveyed to Moore and
his associates in 1863, and in his deed described the
property as "what is known as 'Abernethy Island,' at
the falls of the Willamette River, in Clackamas County,
State of Oregon," the natural conclusion is that he in-
tended to convey the old island mill property. That
was the only island to which he had any claim, as
shown by the evidence, and was then, and had been
for a long time prior to that date, well known and
commonly designated and generally recognized as
"Abernety Island." It was not only so known and de-
scribed in the deeds under which he claimed title, but
thirteen years before had been officially so designated
by the act of congress. In view of these facts, it
seems incredible that Lovejoy, who lived at Oregon
City, and who was admittedly familiar with this is-
land, its history and surroundings from the time of
its occupation by the milling company down to the
time of his conveyance to Moore, could have been so

mistaken or confused about the name as to have undertaken to convey some interest in another tract of land by designating it as "Abernethy Island."

And, more than this, at the time of his deed it was not supposed by the people residing in or about Oregon City that there was any island in the river at or near the falls, east of the channel, except the one upon which the island mills had been situated, and which was known as "Abernethy Island." There was a ledge of rocks, exposed at certain stages of the water, above this island, and extending up towards Canemah, which was subsequently surveyed by authority of the government of the United States, and, after some litigation, determined to be a separate island, and has since been known and designated as "Thompson's Island;" but at the time of Lovejoy's deed it was not known or designated by any particular name, and was generally supposed to be either a part of the main land or a mere extension of Abernethy Island. It is true, the widow of Lovejoy, who was called as a witness in this case, says that there was, and had been all the time prior to the passage of the donation act, and prior to the deed from her husband to Moore, a well-known island in the river above the one upon which the island mills were situated, and that Abernethy claimed some right or title thereto, and for that reason it was known as "Abernethy Island," while the lower island was commonly known as "Governor's Island." But in this she is wholly unsupported by any other testimony, and is evidently mistaken. The maps and plats of the public surveys, as well as the testimony of numerous persons who resided at Oregon City during the

time, and whose business interests were such as to render them familiar with the location of the various islands in and about the falls, clearly show that the only body of land in the river east of the channel, recognized at that time as an island, was the one upon which the island mills were located; and the witnesses all testify that they never heard any other island called Abernethy Island. Looking at these facts, which are practically undisputed, it seems to us that no other fair conclusion can be reached but that Lovejoy intended to, and did by his deed of February 28, 1863, convey to Moore and associates, and that they intended to purchase, all his right, title, and interest in and to the island confirmed to the grantees of the Willamette Milling and Trading Company by the act of congress of September 27, 1850, and known as "Abernethy Island." It is a significant fact, supporting this conclusion, that, although Lovejoy lived in the vicinity for twenty years after the execution of the deed to Moore, no claim was ever made by him, so far as this record discloses, that there was any error in the description in said deed, or that it was not intended to or did not convey the island referred to in the act of congress. Nor was any such claim made by his widow or heirs until after they were defeated in the action at law referred to in the pleadings. Indeed, that action was tried upon the theory that the island referred to in the act of congress was the one described in the deed from Lovejoy to Moore and associates, and Mrs. Lovejoy herself so testified at the time, although she now thinks otherwise. In that action, which was instituted at her instigation, and conducted

under her management, plaintiffs relied solely upon
the contention that the deed had never been delivered
to take effect as a conveyance; and as soon as it be-
came apparent that they were unable to support that
contention by competent testimony the case was ad-
mitted to be with the defendant, and a judgment ren-
dered in its favor accordingly.    It was not until some
time after the rendition of such judgment, and after a
motion for a new trial had been denied, that the claim
was put forth that there was a mistake in the *locus in
quo*, or that the deed in question was not intended to
convey the island referred to in the act of congress.
It is not at all probable that, if Lovejoy had intended
to convey some interest in another tract of land, he
would have remained silent for twenty years without
asserting any claim to as valuable a piece of property
as the lower island is shown by the testimony to have
been, or that his widow and heirs would have done
likewise, until after their defeat in the action at law
referred to.    It is contended, or at least it is alleged
in the complaint, that this deed was never delivered
to take effect.    But that question was determined in
the action at law, and is not open to consideration
here.    But, if it was, there is no competent testimony
whatever in the record to support it.

It is also claimed that the defendant in the law ac-
tion was guilty of fraud and deceit in introducing in
evidence the deed from Lovejoy to Moore and associ-
ates, for the reason that in an action brought against
its predecessor in interest by Johnson and Barlow in
1870 to recover the possession of the upper island, or
what is known in the record as "Thompson's Island,"

the defendant pleaded title thereto in itself, and relied for proof thereof upon the Lovejoy deed, and that the judgment in such action, being against it, is, in effect, a declaration that such deed is void. But the history of that litigation shows that some time in 1865 one Allen Thompson filed upon, as a pre-emption, what was afterwards surveyed and designated on the maps and plats of the United States as an island in the river immediately above Abernethy Island, and obtained title from the government thereto. This title he conveyed to Johnson and Barlow, who brought an action of ejectment against the People's Transportation Company to recover the possession thereof. In that action the defendant pleaded title to the *locus in quo*, and claimed that the property upon which Thompson had settled was not a separate island, but was in truth and in fact a part of the Abernethy Island referred to in the act of congress; and, so claiming, in order to show their title, offered and introduced the deed in question. The judgment in the action was in favor of the plaintiffs, but its only effect was to determine that the land sued for was not in fact a part of Abernethy Island, and it in no way affects the validity of the deed under which the defendants claim to own the latter island, and hence there was no fraud in introducing it in evidence in the action at law.

If we are right in our conclusion that the deed from Lovejoy and wife to Moore and associates conveyed the island confirmed to the Willamette Milling and Trading Company by the act of congress, the exact location of such island becomes unimportant in

this case, as we have already suggested. Upon that question, however, a vast amount of testimony has been taken, and it seems to have been the principal question of fact discussed before and determined by the referee, and the discussion thereof occupies considerable space in the briefs of counsel. It is perhaps as well, therefore, that we should indicate our views upon the question, without, however, attempting to review in detail all the evidence bearing thereon. The contention for the plaintiffs is that the islands referred to in the act of congress, and which is designated on the official plats of the United States as "lot 8, in section 31, township 2, range 2 east," lies north of and across the chasm from the present light station; while the defendants' contention is that said station is located on such island. There are two practically undisputed facts in this case, which to our minds, seem conclusive of the question. The first is that prior to the act of congress of 1850, Dr. McLaughlin laid out, surveyed, and platted a portion of the Oregon City claim for a town site, and sold and conveyed lots and blocks with reference thereto. Upon the plat so made by him are represented, with reference to the streets and blocks of the town, and particularly blocks 1 and 75, the location of the island then occupied by the assignees of the milling company, the chasm dividing the same from the main land, and a space on the main land north of and across such chasm, designated on the map as a mill reserve. By section 11 of the act of 1850, which took away from Dr. McLaughlin, and set apart for university purposes, the Oregon City claim, it was made the duty of the surveyor-general

to certify to the commissioner of the general land office all lots or parts of lots sold by him prior to March 4, 1849, and the purchasers or their assigns, in order that patents therefor might issue. In the discharge of this duty, John B. Preston, the then surveyor-general, on November 1, 1851, prepared or caused to be prepared a map or plat showing the survey of lots and parts of lots sold prior to the time specified, and certified to the same for the use and information of the commissioner of the general land office. This map, so far as necessary to any question here, is substantially the same as the prior maps filed by Dr. McLaughlin, and shows substantially the same relative location of the island in question with reference to the streets and blocks of the town. There is no dispute as to the location of blocks 1 and 75, and the testimoney shows that the actual measurements made on the ground from these blocks of the distances and the directions indicated on the plats' locate the island in question at the place contended for by the defendants, and that the point claimed by the plaintiffs as the true location is within the mill reserve. The other prominent factor in the case is that it is shown by the maps, and is agreed by all parties, that Abernethy Island was separated from the main land by a well defined chasm or gorge through the solid basaltic rock, which appears, from the testimony of John McCraken, who was part owner of and superintendent of the island mills during the winter of 1852, and from the official survey and plats of the island as made by and under authority of the government of the United States in the same year, to be

about one hundred feet wide.  Mr. McCraken bases
his judgment upon the fact that in the winter of 1852
the water carried off the bridge across this chasm
which was used for the purpose of reaching the mill
property from the main land, and that he had to get
out stringers and beams for a new bridge; that while
the water was still high he inquired of people whom
he thought would know about the probable width of
the chasm, and found the prevailing opinion to be
that it was about one hundred feet wide; that, acting
on this theory, he cut his timbers for the bridge one
hundred and ten feet long, and when he placed them
in position on the rocks which formed a natural abut-
ment on either side he thinks he had about five feet
to spare on either end.   The notes of the official sur-
vey of the island made in 1852 show that the begin-
ning point for such survey was a point across this
chasm one hundred and five feet from the meander
line on the opposite side, so that it is clear that the
chasm separating Abernethy Island from the main
land was a well defined channel of the river.   It is ad-
mitted that there is a channel answering this descrip-
tion immediately north of the island upon which the
present light station is situated, and the evidence fails
to satisfactorily disclose that there is, or ever was, any
other such chasm north of that point and between it
and block 1 of Oregon City.   Taking the information,
therefore, to be derived from the McLaughlin and
Preston maps, and the fact of this chasm, which is a
fixed and certain landmark, it is impossible to reach
any other conclusion than that the island on which
the old mill was located, and referred to in the act of

congress, is the same one upon which the present light station of the defendant is now located. But, in addition to this, J. W. Meldrum, D. P. Thompson, Capt. Apperson, James Charman, W. C. Johnson, John McCraken, Peter Paquette, and various other persons who lived at and in the vicinity of Oregon City during the time the island was occupied by the Oregon Milling Company, and prior to and since the flood of 1861, —these witnesses, some of whom had exceptional opportunities to observe and know the exact location of this island, and who have been familiar with it from that time until the present, all testify that the light station is upon the same island that was formerly occupied by the milling company, and they say there can be no mistake about this conclusion. In addition to all this, the survey of the engineers who relocated on the ground the government surveys, shows that the island upon which the light station is located accurately and aptly answers the calls in the field notes, and is the only island which does so. So that, however we may view this case, the facts are with the defendants, and the decree must be affirmed.

<div align="right">AFFIRMED.</div>